UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

ACUITY, A MUTUAL INSURANCE　　)
COMPANY,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)　　　　No. 5:15-CV-107-REW
　　　　Plaintiff,　　　　　　　　　)
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　　MEMORANDUM OPINION AND
　　　　　　　　　　　　　　　　)　　　　　　ORDER
SERVICES CONSTRUCTION, LLC,　　)
　　　　　　　　　　　　　　　　)
　　　　Defendant.　　　　　　　　)
　　　　　　　　　　　　　　*** *** *** ***

Plaintiff Acuity, A Mutual Insurance Company, moved for summary judgment on

all claims against Defendant Services Construction, LLC. DE #25. Defendant responded,

DE #29, and Plaintiff replied, DE #30. The motion is ripe for consideration. For the

following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's

motion for summary judgment (DE #25). Services Construction is liable for the as-

audited premiums, but the liability amount presents fact questions precluding summary

judgment.

I.　　　　**Relevant Factual and Procedural Background**

Services Construction engages in carpentry services, namely, "framing for

residential and commercial buildings." DE #25-5 (Livio Dep.), at 5. Following the

suggestion of its insurance agent, Assured Neace Lukens Insurance Agency, Inc., Service

Construction switched from The Hartford to Acuity for workers' compensation and other

business coverage. DE #29-1 (Affidavit of Osvaldo Livio) ¶¶ 2, 5. Per Mr. Livio,

Services Construction's office manager, Neace Lukens advised Services Construction

that it should switch to Acuity because "it is better." *Id.* ¶ 5. On July 9, 2012, Acuity

issued a policy to Services Construction, renewed the next year by Services, which provided general liability and workers' compensation coverage. DE #25-2 (Policy), at 3; *see also* DE ##25-3 (Affidavit of Scott VanNorwick) ¶ 3; 29-1 ¶ 7. The parties now dispute the amount of premium owed Acuity for the Policy year between July 9, 2012, and July 9, 2013, as well as the partial Policy year between July 9, 2013, and November 17, 2013.

Per the Policy, Acuity calculated premiums for both the workers' compensation and general liability coverages based on the total remuneration paid by Services Construction for labor during the Policy year. DE #25-3 ¶ 3; *see also* DE #25-2, at 4, 22. Part Five of the Workers' Compensation Policy sets out the premium provisions governing the contract. Specifically, the Policy calculates premium by multiplying a classification rate by premium basis, i.e. remuneration. The Policy Information Page notes the premium as based on "Estimated Total Annual Remuneration," and is "subject to verification and change by audit." *Id.* at 4. Further:

### B. CLASSIFICATIONS

Item 4 of the Information Page shows the rate and premium basis for certain business or work classifications. These classifications were assigned based on an estimate of the exposures you would have during the policy period. If your actual exposures are not properly described by those classifications, we will assign proper classifications, rates and premium basis by endorsement to this policy.

### C. REMUNERATION

Premium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of:

1. All your officers and employees engaged in work covered by this policy; and

2.  All other persons engaged in work that could make us liable under Part One – Workers' Compensation Insurance of this policy. If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured their workers' compensation obligations.

DE #25-2, at 10-11.

At issuance, Acuity calculated an estimated annual premium based on Services Construction's estimated total annual remuneration of $48,100 and a work classification of "Carpentry – Construction of Residential Dwellings Not Exceeding Three Stories In Height." *Id.* at 4. As stated on the Policy Information Page, this initial premium, remuneration, and classification "is subject to verification and change by audit," with such audit resulting in a final assessed premium. *Id.* The Policy language further explains:

E. FINAL PREMIUM

The premium shown on the Information Page, schedules and endorsements is an estimate. **The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis** and the proper classifications and rates that lawfully apply to the business and work covered by this policy. **If the final premium is more than the premium you paid to us, you must pay us the balance.** If it is less, we will refund the balance to you. The final premium will not be less than the highest minimum premium for the classifications covered by this policy.

. . .

G. AUDIT

You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy period

3

> ends. Information developed by audit will be used to determine final premium. Information developed by audit will be used to determine final premium. Insurance rate service organizations have the same rights we have under this provision.

*Id.* at 11 (emphasis added).

The general liability coverage premium has similar provisions regarding initial billed premium and audit requirements, again with premium based, in part, on Services Construction's payroll, as well as total cost of any subcontracted work. *Id.* at 22-23. The Policy states that initial quoted premium, *i.e.*, Total Advance Premium, is:

> The Total Advance Premium shown above is based on the exposures you anticipated at the time this coverage part began. We will audit this coverage part in accordance with the Bis-Pak Liability and Medical Expenses Condition entitled Premium Audit – Business Liability at the close of the audit period.

*Id.* at 22. The Premium Audit – Business Liability provision is as follows:

> a. We will compute all premiums for this Coverage Form in accordance with our rules and rates.
> b. Premium shown in this Coverage Form as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. If a premium payment is due, we will send notice to the First Named Insured. The due date for audit premiums is that date shown as the due date on the bill. If the sum of the advance premium is greater than the earned premium, we will return the excess to the First Named Insured.

*Id.* at 37. Acuity, again, calculated Services Construction's Total Advance Premium based on payroll of $48,100. *Id.* at 22.

Services Construction renewed the Policy for the July 2013 – July 2014 Policy term. Following the first Policy period, Acuity performed an audit of Services Construction's business records. During the audit, Services Construction provided some records detailing payroll and other remuneration paid during the July 2012 – July 2013 Policy period. DE ##25-3 ¶ 5; 29-1 ¶ 9. As part of these records, Acuity received and

4

reviewed a copy of Services Construction's Federal Form 1096 for calendar year 2012.

DE ##25-3 ¶ 5; 25-4 (Tax Documents), at 3. This Form 1096 lists a total of $612,387.00

paid to 42 recipients of Federal 1099-MISC forms. *Id.* Per Acuity, the auditor requested

copies of all Form 1099-MISC's for the 2012 calendar year, and Services Construction

advised it did not have copies of the forms.[1] *Id.* During discovery, Services Construction

produced the 2012 Federal Schedule C for Eduardo Rodriguez Rosas (sole-member of

Services Construction), which lists $612,387.00 in LLC "contract labor" expenses. DE

#25-4, at 2. Based on the reported $612,387.00 in payments to individuals for contract

labor or other services performed in calendar year 2012, which Acuity classified as

remuneration under the Policy, Acuity recalculated the premium owed for the July 2012 –

July 2013 Policy period, as well as the estimated premium for the July 2013 – July 2014

Policy period. DE #25-3 ¶¶ 6, 7. Acuity increased the premium basis to an estimated

$660,000 for both Policy periods, representing an estimate of the total remuneration

premised on the $48,100 initial estimated remuneration reported and the payments

($612,387) reflected in the received tax documents. *Id.*

Acuity terminated the Policy on November 17, 2013, for non-payment of

premium. *Id.* ¶ 8. Per the Affidavit of Scott VanNorwick, an Acuity employee, Acuity

issued endorsements to the Policy modifying the premium basis for the July 2013 – July

2014 Policy period to the estimated total remuneration of $660,000. *Id.* Following

termination, Acuity calculated the total premium due for the July 2012 – July 2013 Policy

period and the July 2013 – July 2014 truncated Policy period to be $152,656.96. *Id.*; *id*. at

7 (calculating balance due as of November 18, 2013). Following receipt of additional

---

[1] Services Construction did provide Acuity with copies of **six** 1099-MISC forms at a later
date. *See* DE #29-6 (Copy of June 2014 letter to Neace Lukens).

records from Services Construction regarding the second Policy period, Acuity, using a lower estimate premium basis, reduced the payment due by $35,036.00. DE #25-3 ¶ 9. Ultimately, Acuity calculated the total sum owed by Services Construction, as claimed in this suit, to be $117,620.96. *Id.* ¶ 10; *id.* at 7 (balance due as of May 2, 2014, based on subsequent audit of prorated second Policy period).

Services Construction disputes this liability and calculation. Per Defendant, any payments it made to individuals reflected on a Form 1099-MISC were payments made to independent contractors, not employees, and therefore, remuneration paid to these individuals should not have been included to calculate the Policy premium bases. DE #29-5 (Services Construction Answers to Interrogatories), at 4, 5, 7 (answers to Interrogatory Nos. 7, 10, 19). Per Services Construction, it had only three actual employees on its payroll: Eduardo Rodriguez, Superintendent; Salvador Rodriguez, Foreman; and Enrique Gonzales, Carpenter. *Id.* at 2 (answers to Interrogatory Nos. 4 and 5). Defendant attached payroll documents to its summary judgment response that support a total amount of remuneration paid to these three employees between July 2012 and July 2013 of $61,053.75. *See* DE #29-4. While maintaining that payments made to independent contractors do not form a proper basis for any additional premium, Services Construction does admit that these payment were made in exchange for carpentry services on residential dwellings and that it neither has in its possession nor provided Acuity copies of any documentation showing these independent contractors were covered by other workers' compensation insurance. DE #25-6 (Services Constructions Responses to Requests for Admissions), at 2-4 (responses to Request Nos. 2, 6, 7). Services Construction also disputes the application and validity, but perhaps not the interpretation

or meaning, of the premium audit and adjustment provisions, claiming that the company did not agree to these terms within the contract and, alternatively, that the terms are unconscionable.

Acuity filed the instant lawsuit alleging that Services Construction breached the insurance contract by failing to pay the final premium calculated following the audit. DE #1 (Complaint). Acuity seeks unpaid sums totaling $117,620.96. *Id.*; DE #25. Following discovery, Acuity filed the instant motion, which the Court now addresses.

## II.     Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute.").

If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp. v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

## III. Analysis

Acuity contends that, based on an accurate calculation of Services Construction's remuneration, Defendant "is indebted to Acuity for the sum of $117,620.96." DE #1, at 4. In its motion, Acuity primarily argues that remuneration paid to all contractors/1099-MISC recipients by Services Construction is the appropriate basis for calculating premiums under the Policy. DE #25-1, at 7-11. Specifically, Acuity cites the Policy provision defining remuneration (for premium purposes) as including "all remuneration paid . . . for the services of": "[a]ll other persons engaged in work that could make us liable under Part One – Workers' Compensation Insurance of this policy," DE #25-2, at 10-11. Citing Kentucky law,[2] Acuity claims that Services Construction (and Acuity, by extension) was liable for workers' compensation benefits for any and all 1099-MISC recipients engaged in carpentry work and not otherwise covered by workers' compensation insurance. DE #25-1, at 7-11. Acuity asserts that an estimated total remuneration (at least as to the July 2012 – July 2013 Policy period) of $660,000 mandates the payment demanded. *Id.* at 11.

In response, Services Construction employs two different strategies in an attempt to defeat summary judgment. First, Defendant attacks the validity of the Policy, particularly the provision allowing for unilateral recalculation of premium based on the

---

[2] Both sides rely only on Kentucky law; the Court thus, without separate choice of law analysis, treats the matter as governed by the substantive law of the Commonwealth in this diversity case. *Erie Railroad. Co. v. Tompkins*, 58 S. Ct. 817, 822 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."); *see also Legg v. Chopra*, 286 F.3d 286, 289 (6th Cir. 2002) ("In federal diversity actions, state law governs substantive issues[.]"). The Policy invokes Kentucky as the operational state for workers' compensation. DE #25-2, at 3.

actual, audited remuneration. Defendant argues: (1) "there was no agreement to pay additional premiums" and therefore no "meeting of the minds" regarding the Policy term, relying in part on the "Doctrine of Reasonable Expectations"; and (2) "such an agreement [to pay adjusted, additional premiums] would be unenforceable as an unconscionable agreement." DE #29, at 4-6. Second, Services Construction argues that the individual recipients of 1099-MISC's were all "independent contractors," and therefore, Services Construction would not be liable to the recipients for workers' compensation benefits. *Id.* at 6-9. Without liability to these individuals under the Kentucky workers' compensation framework, Services Construction argues the predicate for Acuity's recalculation does not exist. *Id.* at 9.

The Court has reviewed the entire record. The Policy, including the challenged premium provision, is valid and enforceable. Services Construction's arguments to the contrary fail. Further, as correctly articulated by Acuity, under Kentucky law, Services Construction (and thus Acuity) would and inarguably could, on this record, be liable to all contractors, independent or otherwise, engaged in carpentry work and paid by Services Construction. Services Construction is thus liable for the premiums, but there are questions about the precise recalculation, which precludes judgment as to the element of damages.

A.    *Contract Validity*

In response to Acuity's motion for summary judgment, Services Construction denies liability for the alleged unpaid premiums based on resistance to the pertinent Policy terms. Defendant does so in two ways. First, it claims that the provisions in the Policy allowing for adjustments in annual premium based on Acuity audits of

Defendant's business records were not within Defendant's reasonable expectations. Second, even if the premium provisions were an unambiguous and expected part of the Policy, such terms were unconscionable. Neither argument has merit.

1.     Doctrine of Reasonable Expectations

Services Construction, relying on the "Doctrine of Reasonable Expectations," first argues that the parties did not reach the requisite "meeting of the minds" as to the audit and final premium terms of the Policy, foreclosing the application of those elements. DE #29, at 4-5. Defendant's argument rests on the following factual basis: (1) Neace Lukens, a registered agent of Acuity and an insurance agency from which Defendant previously purchased insurance, advised Services Construction to switch its workers compensation and liability insurance coverage to Acuity because "it is better"[3]; (2) Neace Lukens did not inform Defendant "of any changes to any terms in relation to the insurance policy" between the old coverage and the Acuity Policy; and (3) neither Neace Lukens nor Acuity discussed with Services Construction how a premium would be calculated under the Policy. DE #29-1 ¶¶ 5-7. Defendant reasons that it had a "reasonable expectation that

_____

[3] Acuity objects that the statement "it is better," documented in the Livio Affidavit, is inadmissible hearsay, and therefore, the Court should not consider it when deciding the instant motion. DE #30, at 3. The statement, however, likely is not hearsay because it is an opposing party statement under Rule 801(d)(2)(D). Fed. R. Evid. 801(d)(2)(D) ("A statement that meets the following conditions is not hearsay: . . . The statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]"). The declarant here allegedly is an employee of Neace Lukens, an entity registered as an authorized insurance agent in the Commonwealth since February 7, 2012 (through September 18, 2016, the "current as of" date listed on the Kentucky Department of Insurance website screenprint attached to Services Construction's response). *See* DE #29-2 (List of Active Agents for Acuity). The statement is offered against Acuity, the principal and the party opponent. Finally, the agency relationship was in effect when the statement was made (summer of 2012) and within the scope of the agency relationship. Accordingly, for summary judgment purposes, the Court will consider the statement as contained in the affidavit.

their premium would be the same or lower as there is really no other qualitative difference among national insurance carriers." DE #29, at 5. As such, Services did not agree to the premium calculation terms and "was [led] to believe . . . that the premium would be the same or lower than what it had been paying for the previous four years." *Id.*

Under Kentucky law, "courts are . . . bound to look at an insured's reasonable expectations in deciding whether the insurance contract is ambiguous and what the contract means," by applying the doctrine of reasonable expectations. *Kentucky Employers' Mut. Ins. v. Ellington*, 459 S.W.3d 876, 883 (Ky. 2015). Further:

> "The rule of interpretation known as the 'reasonable expectations doctrine' resolves an insurance policy ambiguity in favor of the insured's reasonable expectations." *Aetna Cas. & Sur. Co. v. Commonwealth,* 179 S.W.3d 830, 837 (Ky.2005); *see also True v. Raines,* 99 S.W.3d 439, 443 (Ky.2003) ("[T]he reasonable expectation doctrine ... resolves an insurance-policy ambiguity in favor of the insured's reasonable expectation...."). The basic thrust of this doctrine is "that the insured is entitled to all the coverage he may reasonably expect to be provided under the policy." *Simon [v. Continental Ins. Co.,* 724 S.W.2d 210, 212 (Ky. 1986]* (quoting R.H. Long, *The Law of Liability Insurance* § 5.10B). Where a person has paid a premium for a policy, the policy should not be read technically to avoid paying benefits. *See Aetna Cas. & Sur. Co.,* 179 S.W.3d at 837 ("We believe 'an insurance company should not be allowed to collect premiums by stimulating a reasonable expectation of risk protection in the mind of the consumer, and then hide behind a technical definition to snatch away the protection which induced the premium payment.'" (quoting *Moore v. Commonwealth Life Ins. Co.,* 759 S.W.2d 598, 599 (Ky.App.1988))). "Only an unequivocally conspicuous, plain and clear manifestation of the company's intent to exclude coverage will defeat that expectation." *Simon,* 724 S.W.2d at 212 (quoting R.H. Long, *The Law of Liability Insurance* § 5.10B). This test looks to the reasonableness of what an insured may believe about coverage, and necessarily relies heavily on the facts.

*Id.* Courts consider a particular provision's placement within the policy, the opacity or obscurity of the language used in the provision, and the facts underlying the insured's

reasonable expectations in light of the policy language, among other things. *See Bidwell v. Shelter Mut. Ins. Co.*, 367 S.W.3d 585, 590-92 (Ky. 2012); *Simon*, 724 S.W.2d at 213.

Acuity categorically rejects application of the doctrine of reasonable expectations based on the lack of predicate ambiguity. There is much law to that effect. *See True v. Raines*, 99 S.W.3d 439, 443 (Ky. 2003) ("[T]he reasonable expectation doctrine . . . resolves an insurance-policy ambiguity in favor of the insured's reasonable expectation . . . and applies only to polices with ambiguous terms[.]"); *Owners Ins. Co. v. Smith and Griffith Siding, LLC*, No. 5:14-CV-142-KKC, 2016 WL 1222249, *3 (E.D. Ky. Mar. 28, 2016) ("However, the doctrine of reasonable expectations is only applicable where the language of the policy is ambiguous." (quoting *Lifeline Health Grp., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 665 F. Supp 2d 770, 777 (W.D. Ky. 2009)). Is the doctrine a tool for finding or only a tool for resolving policy ambiguity? It is too strong, after *Ellington*, to say expectations have no place in determining ambiguity. As the Kentucky Court of Appeals stated recently:

> The doctrine of reasonable expectations plays a critical role in how courts apply these rules. Ascertaining the objective and reasonable expectations of the insured guides the court in determining ambiguity from the outset. *Estate of Swartz v. Metro. Prop. & Cas. Co.*, 949 S.W.2d 72, 76 (Ky. App. 1997). "Despite the apparent clarity of the [terms of the insurance] agreement, courts are nevertheless bound to look at an insured's reasonable expectations in deciding whether the insurance contract is ambiguous and what the contract means." *Ellington*, 459 S.W.3d at 883.

*Riley v. State Farm Mut. Auto. Ins. Co.*, No. 2015-CA-000980-MR, 2016 WL 6892581, at *3 (Ky. Ct. App. 2016). Kentucky law envisions that the particulars of a given situation could inject ambiguity into terms nominally clear. That is not the case here. The Acuity Policy facially and unambiguously, and quite logically, pegs the premium to actual, audited remuneration.

The reference to the Agent's stray "It is better" remark does not change the analysis. It is unclear whether the alleged remark modifies the comparative company or the comparative policy, but nothing suggests a premium promise. Further, Services Construction, agreeing that the national carriers are comparable, does not provide its prior policy as a point of contrast. In a world where premium depends on risk, and risk depends on workforce size, the Court would be surprised if the prior policy had no audit mechanism. More likely, either Services Construction changed its business model or the insurance company never took a closer look at the particulars. The subjective, *post hoc* view of the insured is not the proper prism. Indeed:

> What is reasonable is to be judged from the perspective of an ordinary layman, "rather than considering the policyholder's subjective thought process regarding his policy." *Sparks v. Trustguard Ins. Co.*, 389 S.W.3d 121, 128 (Ky. App. 2012); *see also Marcum v. Rice*, 987 S.W.2d 789, 791 (Ky. 1999) ("The reasonable expectations of an insured are generally determined on the basis of an objective analysis of separate policy items and the premiums charged for each.").

*Riley*, 2016 WL 6892581, at *3. Services Construction gets no benefit of the doctrine here, where the policy is clear, the premium quite rationally rests on the insurer's underwritten risk, and any surprise results from the practices of Services, not the Policy of Acuity.

Here, audit and final premium provisions are neither ambiguous nor hidden within the Policy. The Information Page plainly signifies the estimated status of the premium and audit condition. The premium provisions clearly appear under the header "PART FIVE – PREMIUM," located on page 4 and 5 of the "Workers' Compensation and Employers' Liability Insurance Policy." DE #25-2, at 10-11. The Policy inarguably states: "The premium shown on the Information Page, schedules and endorsements is an

estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis[.] . . . You will let us examine and audit all your records that relate to this policy. . . . Information developed by audit will be used to determine final premium." *Id.* at 11. Services Construction does not dispute the clarity of the Policy language. There simply is no ambiguity, and Services Construction should have known the terms of the contract it voluntarily entered. *See Ellington*, 459 S.W.3d at 880 ("First, we determine what the policy says and whether it includes any ambiguity. . . . In this case, the policy, by its clear language, excludes Ellington from coverage and contains no ambiguity. Thus, we resolve this case in the first step of the analysis.").

It is not reasonable for Services Construction to base its understanding of an insurance policy on the ambiguous comparative tout of an agent instead of actually reviewing and reading the insurance policy. Services Construction does not assert that it never received a copy of the Policy. "[I]nsured persons are charged with knowledge of their policy's contents[.]" *Bidwell*, 367 S.W.3d at 592 (citing *Nat'l Life & Accident Ins. Co. v. Ransdell*, 82 S.W.2d 820, 823 (Ky. 1935) ("He may not have read [the policy], but he is chargeable with the knowledge of its contents.")). Services Construction contracted for the comp and business liability coverage it received. The dispute really is over the risk-basis and metering of the premium. In truth, Defendant is contesting factual application of the recalculation rather than the right of recalculation. Defendant claims its independent contractors simply should not be counted under the remuneration theory: "Services disagrees with Acuity's accounting of individuals that would be covered under its policy." DE #29-5, at 4 (Answer No. 8); *id.* (Answer No. 7: "To the extent that any laborer was an independent contractor it is Services['] contention that they would not be

liable for worker's compensation benefits"). The Court assesses that issue in Part III.B of this Opinion. The Policy is not invalid based on any contract formation or term construction argument.[4]

### 2. Unconscionability

Services Construction next argues that the Policy's premium terms were unconscionable. Under Kentucky law, "a written agreement duly executed by the party to be held, who had an opportunity to read it, will be enforced according to its terms." *Schnuerle v. Insight Commc'ns Co., L.P.*, 376 S.W.3d 561, 575 (Ky. 2012). The doctrine of unconscionability provides a narrow exception:

> The doctrine is used by the courts to police the excesses of certain parties who abuse their right to contract freely. It is directed against one-sided, oppressive and unfairly surprising contracts, and not against the consequences *per se* of uneven bargaining power or even a simple old-fashioned bad bargain. An unconscionable contract is one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other.

*Id.* (citations and quotation marks omitted). Unconscionability comes in two flavors: procedural and substantive. *Id.* at 576. Procedural unconscionability "pertains to the process by which an agreement is reached and the form of an agreement, including the

---

[4] Services does not expound on its "meeting of the minds" theory, a contract formation principal. Under Kentucky law, "[t]o consummate a binding contract . . . there must be a meeting of the minds of the parties or mutual assent to the same thing, and all material terms and conditions of the contract, including a certainty of the subject matter, must be agreed on." *McGeorge v. White*, 174 S.W.2d 532, 533 (Ky. 1943). Here, Services Construction did purchase the Policy, and Acuity issued it. DE #29-1 ¶ 7. Defendant agrees it had certain coverages, which it procured; it renewed the Policy after year one. It contends: "Services paid for the insurance coverage that it contracted for under the terms of the insurance agreement." DE #29-5, at 5 (Answer No. 11). While it tries to pin blame on Acuity's agent, Services Construction received the clear Policy and benefitted from its existence by having coverage for its entire workforce during the Policy term. There was a meeting of the minds, as to the terms and operation of the Policy, as defined under Kentucky law.

use therein of fine print and convoluted or unclear language. . . . Factors relevant to the procedural unconscionability inquiry include the bargaining power of the parties, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice." *Id.* (citations and quotation marks omitted). Substantive unconscionability "refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent. . . . [C]ourts consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Id.* at 577.

Services Construction provides no factual support, specific case citations, or really any analysis to support its brief unconscionability gambit. Defendant entirely contends: "In the case at bar, the claims by the Plaintiff that it is to be given free reign [sic] to determine the basis and amount of additional premiums to charge Services after the fact is a contract which no man in his senses would make and no fair and honest man would accept." DE #29, at 6. In addition to providing minimal substantive argument, Services Construction actively mischaracterizes the premium calculation terms. The Policy does not allow Acuity the power to charge additional premiums on a whim or unilaterally. The terms clearly tie any premium adjustment to a specific audit of the insured's business and a final, historical ascertainment of remuneration. Remuneration and the predicates for adjustment stayed wholly in the control of Services Construction.

As to procedural unconscionability, the premium provisions are conspicuous and clearly labeled within the Policy. The language is not ambiguous and is stated in clear terms. **Further,** allowing for the adjustment of premium based on the actual risk exposure

to Acuity does not "alter the principal bargain in an extreme or surprising way." *Id.* As to substantive unconscionability, it is not unreasonable for an insurance company to base premium on the scope of the insured risk. Kentucky courts have enforced almost identical provisions. *See Harvest Homebuilders, LLC v. Kentucky Employers' Mut. Ins.*, No. 2008-CA-000420-MR, 2009 WL 1424028, at *2 (Ky. Ct. App. May 22, 2009). The premium provision are not unconscionable.

Thus, Services Construction contracted to have workers' compensation coverage. The Policy ties coverage to the statutory scope of liability under Kentucky law, logically pegging the premium to the actual remuneration paid by Defendant for covered work during the term. Defendant contends its risk (and thus premium) should not have reflected contractor payments, but the Policy plainly gave Services Construction an out. As Kentucky law envisions, Services Construction would not have been liable (and would not have had a premium obligation) for contractors otherwise covered by a separate policy. The Policy terms are not unconscionable.

B.      *Remuneration and Premium Calculation*

Having addressed the enforceability of the Policy's premium terms, the Court turns to the central issue of the suit: under the terms of the Policy, would Acuity (and Services Construction) have been liable for workers' compensation benefits under Kentucky law for the persons receiving remuneration from Defendant? Is the audited premium basis of $660,000, hinging on the amounts paid to individuals receiving 1099-MISC forms from Services Construction, proper?

Services Construction does not dispute that: (1) the Policy calls for final calculation of premium based on total remuneration paid by the insured during the Policy

period; and (2) remuneration includes, in addition to any payroll and business officers and employees, "[a]ll other persons engaged in work that could make us liable under Part One – Workers' Compensation Insurance [i.e. under Kentucky workers' compensation law]," DE #25-2, at 10-11; *id.* ("[T]he contract price . . . may be used as the premium basis."). Services Construction also does not dispute that it paid $612,387 to individuals during the 2012 calendar year (as reflected on 1099-MISC forms filed that year). Instead, Services Construction asserts that all individuals receiving 1099-MISC payments were independent contractors, and therefore, remuneration paid to these individuals would not be a proper premium basis under the Policy.

Kentucky defines a statutory employee for workers' compensation purposes, in relevant part, as follows:

> Every person, including a minor, whether lawfully or unlawfully employed, in the service of an employer under any contract of hire or apprenticeship, express or implied, and all helpers and assistants of employees, whether paid by the employer or employee, if employed with the knowledge, actual or constructive, of the employer[.]

K.R.S. § 342.640(1); *see also id.* § 342.640(4) (employee includes: "Every person performing service in the course of the trade . . . of an employer[.]"). This definition of statutory employee does not, itself, encompass independent contractors. *See Hale v. Bell Aluminum*, 986 S.W.2d 152, 154 (Ky. 1998) ("[A]n independent contractor is not an employee and does not come within the scope of the Workers' Compensation Act."); *Fields v. Twin City Drive-In*, 534 S.W.2d 457, 459 (Ky. 1976) ("[T]he court is of the opinion that there is no intention manifested by the legislature to encompass an independent contractor within the definition of 'employee' as used in the Workmen's Compensation Act."). Accordingly, to the extent Services Construction's remuneration

during the Policy periods includes payments to independent contractors, that remuneration alone, and subject to § 342.610, would not make Acuity liable for workers' compensation benefits.

*Ratliff v. Redmon*, 396 S.W.2d 320 (Ky. 1965) lays out the proper legal analysis for determining whether an individual is an independent contractor or employee. *See Uninsured Employers' Fund v. Garland*, 805 S.W.2d 116, 118 (Ky. 1991). *Ratliff* sets out the following nine-factor test:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) The kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; and (i) whether or not the parties believe they are creating the relationship of master and servant.

*Ratliff*, 396 S.W.2d at 324–25. Kentucky courts have distilled these *Ratliff* factors into four predominant ones:

> (1) the nature of the work as related to the business generally carried on by the alleged employer; (2) the extent of control exercised by the alleged employer; (3) the professional skill of the alleged employee; and (4) the true intent of the parties.

*Garland*, 805 S.W.2d at 119. "Whether [an individual is] an employee or an independent contractor is a question of law if the facts below are substantially undisputed, and is a question of fact if the facts are disputed." *Id.* at 117.

Services Construction seeks to claim independent contractor status for all 1099-MISC recipients except for Eduardo Rodriguez, Salvador Rodriguez, and Enrique

Gonzales.[5] DE #29-5, at 2. The record specifically identifies eight of these independent contractors by name: Misael Purata, Gabino Flores, Ariel Lopez, Jose Vasquez, Ricardo Gutierrez, Noel Gutierrez, and Jose Paulin. DE #30-1 (Livio Dep.), at 5-12. These eight, per Services Construction's officer manager Osvaldo Livio, were the "trustworthy" workers, who had "work[ed] with us for quite a while." *Id.* at 13. Per Livio, there were "hundreds" of other independent contractors during the Policy periods who worked with Services Construction for "three weeks a month, and then they leave." *Id.* at 12. All workers did carpentry for Defendant.

After careful review, the Court finds judgment on liability, in Acuity's favor, as compelled by the record and Rule 56. The Policy stakes premium to total remuneration, providing:

> C. REMUNERATION
>
> Premium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of:
>
> 1. All your officers and employees engaged in work covered by this policy; and
>
> 2. All other persons engaged in work that could make us liable under Part One – Workers' Compensation Insurance of this policy. If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured their workers' compensation obligations.

---

[5] In its Answers to Interrogatories Nos. 4 and 5, Services Construction identifies these three individuals as on "payroll." DE #29-5, at 2. Most curiously, the 1099-MISC forms in the record include 1099s for Eduardo and Salvador Rodriguez. *See* DE #29-6.

DE #25-2, at 10-11. Thus, if Services Construction paid remuneration to a "person . . . engaged in work that could" be covered by the Policy as a comp liability, it became part of the final premium unless the insured showed proof that such contract work had other workers' compensation coverage. The case Acuity cites, *Harvest Homebuilders*, largely decides the case. On very similar policy terms, the *Harvest* Court gave judgment to the insurer as to a recalculated premium based on total remuneration, including remuneration to contractors. The insured could not prove counter-coverage, and the Court put that burden on the insured under like policy language. The situation here is indistinguishable.

Kentucky Revised Statutes § 342.610(2) puts a contracting party on the hook for workers' compensation as to subcontracted labor, where the contract involves "work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession" of the hiring contractor. This liability applies "unless the subcontractor . . . has secured the payment of compensation as provided for in this chapter." *Id.* The idea is to encourage parties to hire responsible, *i.e.*, covered, subcontractors. *See Elkhorn-Hazard Coal Land Corp. v. Taylor*, 539 S.W.2d 101, 103 (Ky. 1976) (describing an animating principle behind § 342.610(2) is "[t]o discourage owners and contractors from hiring financially irresponsible contractors and subcontractors"). Subcontracting for duties part of the "regular or recurrent part of the work" of a business makes the hiring party liable for comp coverage to those doing the work, absent proof of alternative coverage.

Here, Services Construction undoubtedly paid those doing the work, all of whom it now calls "independent contractors for carpentry," far in excess of the $48,100 estimated payroll for the July 2012 – July 2013 Policy year. Indeed, the 2012 calendar

year contract labor total was $612,387. DE #25-4, at 2 (2012 Schedule C). Defendant's office manager described several of the laborers as employees in his deposition. Later, in an affidavit, the manager tried to change the depiction. Ultimately, Defendant could produce 1099's for only a handful of workers. It produced other workers' comp coverage proof for exactly none of the laborers involved.

Services Construction is a residential framing company. That is its scope of work, its "regular or recurrent . . . business." *See* DE #29-5, at 4 (Answer No. 15: agreeing that the "scope of [its] business . . . consisted of . . . carpentry services on the construction of new residential dwellings"). The actual workers were framers, involved in carpentry for Defendant. As to the $612,387 2012 total, Services Construction tellingly said that was "payments for services to subcontractors . . . payments to subcontractors and third parties." DE #25-5 (Livio Dep.), at 7. Defendant admits that the subcontractors did the work and claims it did not "control the number of people that the independent contractors used on their crews, nor did it ever hire or fire any of the crew members." DE #29-1 (Livio Affidavit) ¶ 19. Plainly, each alleged contractor, as reflected in the 1099 history, **potentially** falls under the § 342.610(2) umbrella.[6] Acuity logically tied its risk to remuneration to persons that "could make us liable" for comp coverage. Under the Policy, Services Construction retained full control over the risk scope because it could have hired only contractors with confirmed and documented effective coverage. Such

_____

[6] The lack of 1099 information means the status and structure of payees is not knowable on this record. The Affidavit suggests subcontractors ran crews. Notably, even a self-employed contractor could qualify as an employee for purposes of KRS Chapter 342. *See* KRS § 342.012 (noting scenario where owner may qualify as "employee"). Here, Services Construction, fully able to protect itself by appropriate hiring and documentation practices, should not complain where Acuity, exposed to risk, seeks the appropriate remuneration-based premium on the full scope where it "could" be liable—such is the very nature of insurance.

proof would remove remuneration as to that contract from the premium basis. Just like the employer in *Harvest Homebuilders*, the Policy puts the onus here on the insured, and Services Construction admits it has no proof to show coverage reducing the premium charge. *See* DE #25-6, at 3-4 (Response No. 8: Defendant admitting that it provided no "documentation supporting the existence of other workers' compensation insurance policies").[7]

The Court does see some factual disputes on the ultimate characterization of workers as employees or contractors.[8] However, there is no need to try that issue because the characterization is not critical to the premium calculation, which hinges on remuneration paid rather than on a particular employer-employee finding. The parties agreed on the premium basis, and there is no factual dispute that Services Construction hired, as part of its regular and recurrent work, $612,000+ in labor with no proof of workers' compensation coverage in effect as to that labor. This means Acuity could have been liable for claims by the actual workers, properly drawing the full remuneration into the premium calculation.

---

[7] Defendant understood the importance, claiming that it "requested [other workers' comp insurance] information from independent contractors." DE #29-5, at 4 (Answer No. 6).

[8] Defendant, it seems, tries on paper to lump each and every one of its workers under the independent contractor guise. Office Manager Livio admitted that many of the persons for whom there are 1099's, who were listed as laborers, or who were on payroll tallies, in fact were "employees" of the company. *See* DE #30-1 (Livio Dep.), at 5-13 (characterizing as employees Purata, Glores, Lopez, Vazquez, and Noel Guttierez). This characterization changed when dispositive briefing occurred. There are elements that suggest employee status (including owner oversight, the provision of tools, etc.). There are elements that support independent contractor status (including control over work duration, potential skill level, crew autonomy, and the stated intention of the parties). The § 342.610 analysis decides the case without the need for a merits resolution on the relationship characterization question.

C.     *Damages*

Disputes, however, remain as to whether the $660,000 remuneration figure, used by Acuity to calculate the premium owed, accurately reflects Services Construction's actual remuneration paid during the July 2012 – July 2013 Policy period (and beyond, until cancellation). First, as noted above, while the 1099-MISC employees were generally engaged in carpentry and framing work, and thus properly categorized as premium class code 5645 ("Carpentry – Construction of Residential Dwellings Not Exceeding Three Stories in Height"), *see* DE #25-2, at 4, at least one, Osvaldo Livio, performed only office work, potentially requiring a different premium class code and basis. *See* DE #29-6, at 4. Second, Acuity arrived at the $660,000 figure by adding the $612,387 in remuneration from Defendant's 2012 Federal Form 1096 (and 2012 Schedule C) to the initial remuneration estimate of $48,100. DE #25-3 ¶¶ 6, 7. This calculation, however, does not reflect that the $612,387 value most certainly includes 1099-MISC monies paid to Eduardo Rodriguez and Salvador Rodriguez, individuals considered by Services Construction as employees and on payroll. DE #29-6, at 5; DE #29-5, at 3. This suggests potential double counting. Third, Acuity calculates its demand on a $660,000 remuneration figure for the July 2012 – July 2013 Policy period based entirely on remuneration figures from **calendar year** 2012. This presents two issues preventing summary judgment on the damages figure. First, the Policy calls for a "final premium" based on the "actual, not the estimated, premium basis" for the Policy period, which was not calendar year 2012, *see* DE #25-2, at 11. Thus, actual remuneration "during the policy period" would be the true liability foundation. Second, the summary judgment record shows substantial inconsistencies between the 1099-MISC values and payroll

values provided by Services Construction for the July 2012 – July 2013 Policy period. *Compare* DE #29-6, at 5 (1099-MISC forms for Eduardo and Salvador Rodriguez reflecting payments of $108,000 for calendar year 2012), *with* DE #29-4 (paycheck stubs for Eduardo and Salvador Rodriguez reflecting payments $51,100 for Policy year July 2012 – July 2013). The Court is cognizant of the fact that Services Constructions provided Acuity with limited documentation as to payroll and total remuneration paid during the audit process—a jury may very well accept the 1099-MISC numbers as the appropriate reflection of remuneration paid during the Policy year. However, at the summary judgment stage, the fact issue persists in the record. Finally, the $117,620.96 calculation of premium due and owing includes additional premium for general liability Bis-Pak coverage bundled with the Workers' Compensation Policy. *See* DE #25-3, at 7 (Account Summary attached to VanNorwick Affidavit). Nowhere, however, does Acuity support its calculation with reference to specifics of that new premium basis. Ultimately, material, though limited, issues of fact exist regarding the proper numerical value of the remuneration and proper calculation of premiums owed for the Policy periods at issue.

To be clear, the Court finds premium liability based on the actual full remuneration paid, it just is unable to ascertain that precise calculation on this record. The questions that persist concern the amount of actual remuneration paid during the July 2012 – July 2013 Policy year and the pro-rated portion of the July 2013 – July 2014 Policy year.[9] The Bis Pak portion and basis also remains subject to precise calculation. Those questions, on this record, the Court reserves for a factual determination at trial.

---

[9] Acuity continues to use the word "estimate" with reference to the premium basis. DE #25-3, at ¶ 6. The Court would expect, per the Policy, the actual known remuneration to be the final basis, and so requires proper proof to calculate the liability.

**IV.     Conclusion**

For the forgoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** DE #25. The Court grants the motion as to Services Construction's liability to Acuity for additional premiums based on an audited remuneration basis. However, material issues of fact exist as to the precise remuneration basis and premiums owed under the Policy. The Court limits any trial to the calculation of damages, specifically the final accounting for the final remuneration basis during the Policy years.

This the 12th day of June, 2017.

Signed By:

*Robert E. Wier*

United States Magistrate Judge